UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOAN McCRAY,

                    Plaintiff,                    No. 09-cv-10896

vs.                                          Hon. Gerald E. Rosen

ANNIE CARTER, TERRY CATHINGS,
MARVIS COFIELD, JOYCE HAYES-GILES,
OTIS MATHIS III, DAVID MURRAY, CARLA
D. SCOTT, IDA SHORT, MARIE L.
THORNTON, TYRONE WINFREY, JIMMY
WOMACK, and the DETROIT BOARD
OF EDUCATION,

                    Defendants.

_____/

OPINION AND ORDER REGARDING
MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____

PRESENT:   Honorable Gerald E. Rosen
                    United States District Chief Judge

## I. INTRODUCTION

This whistleblower retaliation action is presently before the Court on three

motions for summary judgment filed by the various named Defendants[1] and the Motion

---

[1] *See* Dkt # 49, Motion for Summary Judgment filed by Defendant Marie
Thornton;  Dkt #57, Motion for Summary Judgment filed by Defendant Jimmy Womack;
and Dkt. # 58, Motion for Summary Judgment filed by Defendants Annie Carter, Terry

1

to Amend/Correct Complaint filed by Plaintiff Joan McCray.  Responses and Reply Briefs have been filed.

Having reviewed the parties' briefs in support of and in opposition to the various motions, as well as the accompanying exhibits and the remainder of the record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will resolve the parties' motions "on the briefs."  *See* Eastern District of Michigan Local Rule 7.1(f)(2).  This Opinion and Order sets forth the Court's ruling.

## II.  <u>PERTINENT FACTS</u>

<u>THE PARTIES</u>

Plaintiff Joan McCray is the former Chief Financial Officer ("CFO") of the Detroit Public Schools.  McCray was hired by the Detroit Board of Education (the "School Board" or the "Board") in July 2007.  Eighteen months later, her employment was terminated.

Defendants Annie Carter, Terry Catchings, Marvis Cofield, Joyce Hayes-Giles, Otis Mathis III, David Murray, Carla Scott, Ida Short, Tyrone Winfrey and Marie Thornton were members of the School Board during Plaintiff McCray's tenure as CFO.

---

Catchings, Marvis Cofield, Joyce Hayes-Giles, Otis Mathis II, David Murray, Carla D. Scott, Ida Short, Tyrone Winfrey, and the Detroit Board of Education.

Defendant Jimmy Womack was the School Board President.[2]

PLAINTIFF'S HIRING AS CFO

McCray was hired in July 2007 to serve CFO of the Detroit Public Schools ("DPS"). Concomitant with her employment as CFO, McCray was appointed Treasurer of the School Board. McCray assumed the DPS position after serving for two years as Director of Finance and Business Services with the Normandy School District in St. Louis, Missouri. The Normandy School District is much smaller than the Detroit School District,[3] and the position Plaintiff held as Normandy's Director of Finance and Business Services was much less demanding than that of CFO of the DPS. Plaintiff testified that while employed with the Normandy District she was responsible for overseeing a budget of $12 million and supervising only 8 to 10 employees. *See* Plaintiff's Dep., pp. 45-46. In Detroit, Plaintiff was responsible for overseeing an annual budget of $1.2 billion. *Id.* at 67-69.

At the time McCray was employed with the Normandy School District, the Superintendent of Normandy was Dr. Connie Calloway. At some point prior to July 2007, McCray learned that Dr. Calloway was relocating to Detroit to assume the role of Superintendent of the DPS and expressed an interest in relocating with her to serve as

---

[2] Collectively, these individuals are referred to herein as the "Board Defendants."

[3] According to Plaintiff, Normandy has only seven or eight schools and approximately 800-900 employees, *see* Plaintiff's Dep., pp. 61, 69. By contrast, when McCray was hired by the Detroit School Board, Detroit had more than 200 schools and some 16,000 employees. *Id.*, 67, 69.

3

CFO for the DPS.  *Id.* at 82-83.  As the incoming Superintendent, Calloway was given leeway by the Board to recommend individuals that she would like placed in certain key positions within the District.  Calloway recommended Plaintiff for the CFO position, and the Board ultimately voted to approve that recommendation.  *See* Deposition of Jimmy Womack, pp. 95-96, Board Defendants' Ex. 2; Deposition of Carla Scott, p. 124, Board Defendants' Ex. 3.

McCray was employed with the DPS under the terms of a renewable six-month employment contract.  Her contract was renewed twice:  in January and July 2008.  In addition to compensation and benefits, the contract provided that Plaintiff's CFO position was a "non-tenured" position and contained specific provisions for termination of employment by the District with, or without cause:

### 19.    *Termination by the District*

The General Superintendent or Board (or designee) may terminate this Agreement without cause at any time during the term of this Agreement or any extension thereof.  Termination without cause shall not affect the right of the Executive [McCray] to receive compensation and benefits for the unexpired portion of this Agreement up to a maximum of twelve (12) months, to be paid in a lump sum or installments at the District's sole discretion.

The Executive may be terminated with cause at the sole discretion of the Board.  Actions constituting just cause shall be defined exclusively by the Board and include but are not limited to violations of Work Rules and District policies and procedures, and poor job performance.  Though this list is not intended to be exhaustive, for purposes of this Agreement only, the following conduct may constitute cause for termination:

1.    Unsatisfactory job performance, including but not limited to the failure to make satisfactory progress toward implementing

4

performance expectations;
2.    Neglect of duty;
3.    Insubordination;
4.    Misconduct in office;
5.    Violation of law;
6.    Embezzlement or other misuse of the administrative position for personal gain or benefit;
7.    Falsification of records;
8.    Fraud;
9,    Working under the influence of intoxicants or controlled substances not legally prescribed;
10.    Inability to perform the duties and responsibilities of the job;
11.    Failure to cooperate in a legal or quasi-legal proceeding:
12.    Violation of any District policies, procedures or directives, including, but not limited to, acquisition or installation of goods and equipment for demonstration or on a loaned basis without prior authorization of the General Superintendent and/or the Board of Education.

Termination with cause shall abolish the Agreement and all rights of the Executive to receive compensation hereunder.

Termination of the Executive, whether with or without cause, shall not be considered to terminate the Executive's duties under Section 11, Confidentiality, of this Agreement.

Board Defendants' Ex. 15, § 19.

On September 24, 2008, the School Board notified McCray of its intention to not renew her contract when its term expired at the end of the year, and provided her with an opportunity request a meeting with the Board to discuss its reasons for non-renewal. McCray did not request such a meeting and her employment with the DPS was terminated in December 2008.

PROBLEMS ARISING DURING PLAINTIFF'S TENURE AS CFO

Plaintiff began her tenure as CFO of the DPS during a tumultuous period:  the FBI

5

was investigating the District with respect to the alleged misuse of federal funding. Calloway Dep., p. 22, Plaintiff's Ex. 2.  The DPS was also being investigated by the Michigan Department of Education (the "MDE") for violating state and federal law with respect to an alternative schools program.  *Id.* at 27-28.  The MDE also indicated that it was looking into allegations that the District had been improperly overinflating student enrollment, resulting in the State awarding funding to the District to which it was not entitled.  *Id.* at 30.  In addition, the previous CFO had been fired for stealing funds from the District.  *Id*. at 19-22.  Making matters worse, shortly after her hire, McCray learned that the DPS was supposed to have submitted a plan to the State to eliminate the District's budget deficit in 2006 but had failed to do so.  Plaintiff's Dep. pp. 72-74.  Thus, McCray found herself immediately under the gun to prepare a deficit elimination plan, as well as to implement an overhaul of the DPS financial accounting system.  *Id.*

It was under this backdrop that McCray was informed of the existence of the District's use of a "fall out account."  *See* Affidavit of Budget Director Walter Esaw, ¶¶ 4-8.  This "fall out account" was a system developed by the District's Human Resources Department to track those employees, including teachers, who were identified for potential lay off during the development of the budget on an annual basis.  *Id.*, ¶ 4.  For purposes of developing a balanced budget, these employees (who were identified by name, position and union affiliation, if any) were placed in the "fall out account," thereby assuming they would no longer be on the District's payroll for the upcoming fiscal year.

6

*Id.* Accordingly, their salaries were not included in the budget. If, however, it turned out that employees placed in the fall out account were not laid off, the District's budget was directly negatively impacted -- i.e., when these employees were not laid off, the District had to pay for personnel that had not been budgeted for, thereby creating a budget deficit. *Id.* at ¶ 5.

To compound matters, when Dr. Calloway assumed the role of Superintendent, she and McCray decided that the budget should be based on "enrollment" numbers as opposed to "count day" numbers. "Enrollment" numbers are projections made prior to the beginning of each school year as to the number of students the District anticipates will enroll the following year. *Id.* at 6. By contrast, "count day" numbers are reflective of the number of students actually in school on the 4th Wednesday of each semester during the school year. *Id.* The District receives funding from the State based on these actual "count day" numbers. *Id.* Thus, during McCray's tenure, by budgeting based on enrollment numbers, there were instances when the funding the District received for each student was less than what was projected in the budget, which, in turn, created a deficit. *Id.*

McCray was informed of the budget deficit issues related to the fall out account in August 2007. *See* August 31, 2007 e-mail from Walter Esaw to Budget Office Staff, cc'd to Joan McCray, Esaw Aff., Ex. 1. She was also informed about the ramifications of relying on "enrollment" numbers instead of "count day" numbers as early as December

7

2007.  *See* December 19, 2007 e-mail from Walter Esaw to Joan McCray, Esaw Aff., Ex. 2.  In that December 19 e-mail, Esaw notified McCray that he projected a budget shortfall of $53.1 million.  *Id.*

Plaintiff admits that Esaw expressed these concerns to her prior to June 2008. Plaintiff's Dep., pp. 182-85.  Nonetheless she repeatedly told the Superintendent and the Board that there would be no budget deficit.  *See* June 16, 2008 Formal Reprimand -- Identification and Report of Use of Fallout Account, Womack Brief, Ex. 2.  When these matters were finally brought to the attention of the Superintendent and the Board in May 2008, McCray was issued a written reprimand for failing to investigate and provide accurate information.  *See id.*  McCray was admonished in this reprimand:

> Your staff members report that they repeatedly advised you of the urgent, impending deficit and you took no actions on their warning or recommendations.  You are to investigate concerns brought to your attention by consultants and staff.  You are to become fully knowledgeable about the finances of this district.  You are to provide the General Superintendent with current, consistent and accurate information at all times.  Continued infractions will result in additional disciplinary action, up to and including termination.

*Id.*

## McCRAY PRESENTS A DEFICIT BUDGET TO THE BOARD

As indicated, prior to May 2008, McCray advised the Board that the District would not experience a deficit budget for the upcoming '08-'09 school year.  It was not until late May 2008 -- i.e., a month before the '08-'09 budget had to be prepared -- that McCray corrected her stance and reported to the Board that she had incorrectly

previously advised the Board members that there would be a positive fund balance, and

that the District indeed would experience a deficit budget.  This raised the ire of the

Board members , particularly because a deficit budget could trigger the State's

appointment of an Emergency Financial Manager.[4]  Nonetheless, Plaintiff informed the

Board that it could adopt a deficit budget and, ultimately, the Board voted to adopt the

budget McCray had presented.  *See* Womack Dep., pp 136-141.

THE JULY 17, 2008 FINANCE COMMITTEE MEETING

On July 17, 2008, the Finance Committee of the Board held a public finance

information meeting.  McCray attended the meeting.  The Superintendent was out of

town at the time and, hence, was not in attendance at this meeting.  (Deputy

Superintendent Sue Cornell attended in her place.) During this meeting, Board Member

Jimmy Womack  became angry when McCray refused to answer board members'

questions concerning the District's finances and was openly critical of Superintendent

Calloway and Plaintiff McCray.  Womack testified in his deposition as to what had made

him angry and what he had said at the July 17, 2008 meeting:

> Q:     Now, what had Ms. McCray done on that day that caused you to say
>         what you said at the meeting?

---

[4]  As in every year, in 2008, the District was required to adopt a budget by June 30th.  The budget adoption process was especially critical in 2008 due to the fact that the District was operating under a Consent Decree with the State to repay money that had been loaned to the District.  One of the conditions of that agreement provided that if the District reported a deficit budget, the State would consider that fact as a "triggering event" which would automatically result in the appointment of a State-approved financial manager to administer the District's finances.

A [ by Defendant Womack]:  Ms. McCray was asked information about finances. Dr. Calloway was not present.  Ms. McCray said if we needed that information we needed to ask Dr. Calloway.  We, meaning me and other board members, indicated, "Ms. McCray, this is an information session, you are a CFO, this is a finance session, you need to share with us the information and answer questions."  She arrogantly, in my opinion, said "if you want any questions answered you go through the superintendent."

We informed, me and other board members, that "not only are you CFO and it is your responsibility to respond, you are [also] the [Board] treasurer, and the treasurer responds directly to the Board.  By not doing so, Ms. McCray, you are insubordinate."  Ms. McCray, in my opinion, arrogantly said, "Then I will be insubordinate."

That is when I said what I just told you I said, that Dr. Calloway was a condescending, pontificating hustler who was arrogant and incompetent to do this job, that Joan McCray was incompetent to do this job, that Dr. Calloway, and if I recall correctly now that my memory is being generated, I said, "Dr. Calloway," and these were my words, "needed to g-o and you can g-o, too."

Womack Dep., pp. 168-169, Board Defendants' Ex. 2 (internal punctuation added).

When the  Finance Committee meeting concluded, Plaintiff, Deputy Superintendent Sue Carnell and Saundra Howard-McGee, the DPS Grants and Funds Director who also had attended the meeting, returned to Plaintiff McCray's office where McCray called Superintendent Calloway to tell her what had transpired at the meeting and how Jimmy Womack criticized her performance.  According to Deputy Superintendent Carnell, Calloway instructed the three women to write letters to Tyrone Winfrey, the Chairman of the Finance Committee  regarding Defendant Womack's conduct at the meeting.  [*See* Carnell Dep., pp. 35-36, Board Defendants' Ex. 8.]  All

10

three women complied and each wrote a memo to Winfrey complaining about Womack's

negative comments about Superintendent Calloway.  [*See* Defendants' Ex. 9][5]

Plaintiff McCray's memo stated as follows:

TO:          Honorable Tyrone Winfrey, Member, Detroit Board of Education
FROM:      Joan McCray, Chief Financial Officer
DATE:       July 28, 2008
SUBJECT:   Finance Information Meeting

I am writing to express my concern regarding the conduct and behavior of
Board Member Jimmy Womack with his negative and intimidating
comments directed at the Superintendent and administration during the
Finance Committee Information meeting held on July 17, 2008 chaired by
Board Member Tyrone Winfrey and attended by Board Members Marie
Thornton, Otis Mathis and Annie Carter.  Also in attendance were District
state persons Sue C. Carnell, Deputy Superintendent, Walter Esaw,
Executive Director Budget, Saundra Howard McGee, Executive Director of
Funds and Development, Christopher Nelson, Executive Director of
Information Technology, and Regina Smith, Accounting Program
Supervisor.

During this meeting Board Member Womack made several negative
comments directed at the General Superintendent both personally and
professionally as well as comments to intimidate staff.  The comments
included "the Superintendent is threatening vendors, the Superintendent is a
liar, she's gotta go, fire and transfer staff, got the vote".  While I can quote
some of the specific comments of Board member Womack, I do not want
the focus to be lost on validating the comments but rather addressing my
more important concern of Board Member Womack's conduct and
behavior.

---

[5]  McCray claims that no one told them to write the letters.  She testified,

"As we walked -- the three of us were walking back, we just were so upset
about the meeting that we -- we'd already said to each other 'we've got to
put this in writing.'  So I don't know that anyone else told us.  We all came
to that consensus as we were walking back to the office."  [*See* Plaintiff's
Dep., pp. 134-35.]

11

While I acknowledge that halfway into the meeting and after several outbursts by Board Member Womack, Finance Chair Board Member Winfrey did take action to physically remove Board Member Womack from the meeting, this action did not occur until after several repeated negative comments. Furthermore, other board members present did not address Board Member Womack's conduct and behavior directly to him.

Board Member Womack's negative and intimidating comments do nothing to support the Board and administration's efforts to restore credibility and integrity to the DPS educational system. Instead, Board Member Womack's negative and intimidating comments continue to erode an institution floundering both financially and academically.

Board Member Womack's conduct and behavior resulted in a disruptive environment focused on his outbursts of negative personal opinions of the General Superintendent and threats toward staff, when the main goal of the Finance Committee is to address items listed on the agenda as agreed to with the Finance Committee Chair and the Superintendent

[Board Defendants' Ex. 9]

Deputy Superintendent Carnell and Saundra Howard-McGee gave their memos to Tyrone Winfrey on July 24, 2008 at a pre-scheduled weekly finance meeting. Plaintiff McCray testified that, although she had drafted her memo before the July 24 meeting, she had not completed it by that date; she gave her memo to Winfrey on July 28th "the date on the letter." [Plaintiff's Dep., pp. 135-36.]

Winfrey testified that he read the letters handed to him at the July 24th meeting and that he had viewed the letters not only as complaints about Womack's comments and conduct but also as chastising Winfrey himself for allowing such conduct to go on at a meeting he chaired. [*See* Winfrey Dep., pp. 93-98, Defendants' Ex. 10.] After reading the letters, Winfrey abruptly ended the meeting by walking out because, in his opinion, as

12

a Board member he should not be reprimanded by staff.  *Id.*

It was shortly after the July 24 finance meeting that Winfrey, acting in his capacity as Chairperson of the Board's Committee on Finance, Budget, Title I and Legislative Affairs, drafted a memorandum to Carla Scott and Joyce Hayes-Giles, who were at the time the President and Vice-President of the School Board, recommending that McCray be removed from her position as Treasurer of the Board of Education for her dereliction of duties with respect to both her role as Board Treasurer and CFO of the Detroit Public Schools.  *See* Defendants' Ex. 11.[6]  The memo was cc'd to all of the other Board members.  *See id.*  In this memo, Winfrey specifically noted his concerns about Plaintiff's performance in (1) failing to notify the Superintendent and the Board of an impending deficit in a timely manner; (2) her continued reporting of a positive fund balance; (3) her failure to notify him, as Chair of the Finance Committee, of proper monthly income/expenditures reconciliation which led to the district-wide deficit; and (4) her refusal to accept a document from Board Member Marie Thornton at the July 17 Finance Committee meeting.  *See id; see also* Winfrey Dep., pp. 104-106.[7]

---

[6]  Though Winfrey acknowledged that his complaints about McCray's performance in her Board Treasurer role were intertwined with complaints about her performance in her CFO position, he did not request that she be removed as CFO of the School District; he only requested her removal as Treasurer of the Board.  *See* Winfrey Dep., pp. 107-08; *see also* Defendants' Ex. 11.

[7]  At the July 17 meeting, Board Member Thornton wanted Plaintiff McCray to respond to the content of a document, apparently from the State Board of Education, and attempted to give the document to McCray for her to review and respond.  McCray refused to accept the document and told Thornton she had to give the document to the

On August 14, 2008, the Board did, in fact, adopt a resolution removing Plaintiff as its Treasurer.  *See* Defendants' Ex. 12.  Plaintiff's subordinate, Walter Esaw, was subsequently appointed to serve as Interim Treasurer for the Board. (Plaintiff's tenure as CFO of the DPS was not affected by this resolution.)

## THE GOVERNOR DECLARES AN EMERGENCY FINANCIAL SITUATION

Following the School Board's adoption of a deficit budget, on September 17, 2008, the State Superintendent of Public Instruction notified the Governor of the existence of an emergency financial situation at DPS.  *See* Defendants' Ex. 14.  The Governor subsequently appointed a financial review team to evaluate the School District's finances.  *Id.*  The review team ultimately confirmed that an emergency financial situation existed at DPS.  *Id.*

## PLAINTIFF'S CONTRACT IS NOT RENEWED

On the heels of McCray's presentation of a deficit budget, by letter dated September 24, 2008, the DPS notified Plaintiff that it was considering the non-renewal of her contract.  Specifically, the September 24 letter stated as follows:

> Dear Joan McCray:
>
> Pursuant to Section 471a of the Revised School Code, MCL 380.471a, you are hereby notified that the Detroit Board of Education is considering the

---

Committee Chairman, Tyrone Winfrey, who, in turn, would have to give it to the Superintendent, and it only the Superintendent who could give it McCray and demand her response.  Womack purportedly told McCray if she refused to accept the document she was being insubordinate, to which McCray responded, "I will just then be insubordinate."  *See* Womack Dep., p. 180.

non-renewal of your individual administrator contract for the following reasons:

1.      Reorganization within the school district, and/or

2.      Economic Necessity.

You will be afforded an opportunity no later than October 23, 2008, to meet with the Detroit Board of Education to discuss the reasons for considering non-renewal of your contract as referenced in this letter.  The meeting may be scheduled as early as October 7, 2009.  The meeting with the Detroit Board of Education may be open or closed to the public at your option.  **If you request this meeting pursuant to Section 471a, please complete the enclosed form and return it in person or by fax (873-7397) to Lauri D. Washington, Esq., Detroit Public Schools, Employee Relations, 7430 Second Avenue, 4th Floor, Albert Kahn Building, Detroit, MI 48202, no later than 5:00 p.m., October 1, 2008.**

Only you or your representative may address the Detroit Board of Education at this meeting.

Sincerely,

/s/
Connie K. Calloway, Ph.D.
General Superintendent

[Plaintiff's Supplemental Brief in Support of Motion for Leave to File First Amended Complaint, Ex. 1 (emphasis in original).]  A "Meeting Request" form was appended to the letter.  *See id.*  Plaintiff does not dispute that she never requested a meeting as directed in the September 24 letter.  *See* Defendant Thornton's Motion for Summary Judgment, p. 3.

On December 15, 2008, pursuant to the terms of her Employment Agreement, the Board decided to terminate Plaintiff's employment without cause.

15

PLAINTIFF'S COMPLAINT

On March 10, 2009, Plaintiff instituted the instant lawsuit claiming that the Detroit School Board violated her First Amendment rights by retaliating against her after her memo to Tyrone Winfrey complaining about Jimmy Womack's allegedly inappropriate and unprofessional conduct during the July 17, 2008 Finance Committee Meeting.  She also contends that the Board violated the Michigan Whistleblower's Protection Act and the Federal Whistleblower's Protection Act by retaliating against her after she allegedly reported Defendants' misconduct and mismanagement in the operation of the DPS to the Board, and state and federal investigative agencies.  After several repeated extensions of the discovery period, Defendants filed the instant motions for summary judgment.

DISCUSSION

A.  APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434

16

F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere

allegations or denials, but must "cit[e] to particular parts of materials in the record" as

establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P.

56(c)(1).  Moreover, any supporting or opposing affidavits or declarations "must be made

on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P.

56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the

nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at

814 (alteration, internal quotation marks, and citation omitted).

The Court will apply these standards in deciding Defendants' motions for

summary judgment in this case.

B.    PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE
      FIRST AMENDMENT CLAIM

To establish a cognizable claim of retaliatory discharge in violation of the First

Amendment, McCray must demonstrate: (1) that she was engaged in constitutionally

protected speech; (2) that she was subject to adverse action or was deprived some benefit;

and (3) the protected speech was a "substantial" or a "motivating factor" in the adverse

action.  *Brandenburg v. Housing Authority of Irvine*, 253 (6th Cir. 2001) (citing *Mt.*

*Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50

L.Ed.2d 471 (1977)).

In establishing the first prong of the test, Plaintiff must establish that the speech

17

she engaged in is "protected."  *See Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003);

*Haynes v. City of Circleville, Ohio*, 474 F.3d. 357, 362-65 (2007).  To do so, Plaintiff

must first show that she spoke as a citizen on a matter of public concern.  *Pickering v.*

*Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568, 88 S.Ct,

1731 (1968); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684 (1983); *Garcetti v.*

*Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 1958 (2006).  This is a question of law for

the court to decide.  *Connick*, *supra*, 461 U.S. at 148 n. 7;  *Haynes, supra; Nair v.*

*Oakland County, supra.*   If the answer is "no," the inquiry ceases and McCray has no

First Amendment cause of action based on the Board's reaction to the speech.  *Garcetti,*

*supra*; *Connick*, *supra* 461 U.S. at 147.  If the answer is "yes," however, McCray must

then show that her interest in the speech outweighs the government's countervailing

interest in promoting the efficiency of the public service it provides as an employer.

*Pickering, supra*, 391 U.S. at 574; *see also Garcetti, supra.*

1.   IN WRITING HER MEMO TO WINFREY, PLAINTIFF WAS NOT
     <u>SPEAKING IN HER CAPACITY "AS A CITIZEN."</u>

     The threshold inquiry is whether Plaintiff was speaking in her capacity "as a

citizen."  *See Garcetti*, *supra.*  "When a citizen enters government service, the citizen by

necessity must accept certain limitations on his or her freedom." *Garcetti*, *supra*, 547

U.S. at 418. However, public employees do not forfeit all their First Amendment rights

simply because they are employed by the state or a municipality.  *See id*. at 417, 126

S.Ct. 1951; *see also Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d

18

708 (1983) (noting that it is well-established "that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression" (citations omitted)). The Supreme Court has determined that the First Amendment protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern. *Garcetti,* 547 U.S. at 417, 126 S.Ct. 1951. However, when a public employee speaks as an employee on matters of personal interest, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684 (citation omitted).  The employee bears the burden of proving that his or her actions were constitutionally protected in the particular circumstances. *Brandenburg, supra*, 253 F.3d at 897.

The Supreme Court clarified what it means for a public employee to speak as a "citizen" for First Amendment purposes in *Garcetti*. The Court observed that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951.  Justice Kennedy explained:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id*. at 421–22, 126 S.Ct. 1951 (citation omitted).

19

The Court, thus, must look to the content and context of Plaintiff's speech to determine whether her statements were made pursuant merely to her professional duties. *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir.), *cert. denied*, 131 S.Ct. 643 (2010). The Sixth Circuit has identified a number of factors to consider in making this determination. These include "the impetus for her speech, the setting of her speech, the speech's audience, and its general subject matter." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540 (6th Cir. 2012) (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir.2007)). Relevant considerations include whether the statements were made to individuals "up the chain of command," *Fox*, 605 F.3d at 350 (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir.2008)), and whether the content of the speech is "nothing more than 'the quintessential employee beef: management has acted incompetently.'" *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir.2007) (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir.1988)). Factors that may be relevant but are not dispositive also include whether the speech was made inside or outside of the workplace and whether it concerned the subject-matter of the speaker's employment. *Handy-Clay*, 695 F.3d at 541 (citing *Garcetti*, 547 U.S. 420-21).

Applying the foregoing factors to McCray's memo in this case, the Court concludes that in writing the memo, McCray was not speaking in her capacity "as a citizen" but rather she was speaking pursuant to her duties as a public employee. First, McCray's memo was written only to Tyrone Winfrey who chaired the finance meeting

which McCray attended pursuant to her official duties as CFO of the DPS.  The memo was not copied to anyone else either within or outside of the DPS.  The fact that McCray communicated solely to the School Board member who chaired the finance meeting "indicates that she was speaking in his capacity as a public employee. . . , not as a member of the public writing a letter to the editor as in *Pickering*."  *See Haynes v. City of Circleville, Ohio*, *supra,* 474 F.3d 357.[8]

Second, Plaintiff admitted that the memo was written simply because she was "so upset about the meeting" and she "felt [Womack's] conduct and behavior was not appropriate for that meeting," so she decided that something should be "put in writing." [Plaintiff's Dep., pp. 134-35].  The fact that she also opined in the memo that Womack's comments "d[id] nothing to support the Board and administration's efforts to restore credibility and integrity to the DPS educational system" does not convert the memo a matter of public concern.  The focus is not on "what might incidentally be conveyed by

---

[8]  In *Pickering, supra*, the Supreme Court determined that a public high school teacher was speaking in his capacity as a citizen commenting on a matter of public concern when he wrote a letter to the local newspaper in connection with a recently proposed tax increase in which he criticized the way in which the School Board and the district superintendent of schools had handled past proposals to raise new revenue for the schools.  By contrast, in *Haynes v. City of Circleville, supra*, the Sixth Circuit concluded that the plaintiff, a former City of Circleville police officer and handler for the police department's canine unit, was merely speaking as a public employee pursuant to his official duties, and not as a citizen for First Amendment purposes, when he wrote a memo to his superior, the police chief, expressing his displeasure with changes in the canine handling program. Finding that Haynes' memo "focused on his discontent with the new program," the court concluded that "[t]he memo thus reflects nothing more than 'the quintessential employee beef: management has acted incompetently.' *Haynes*, 474 F.3d at 365 (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir.1988)).

21

the fact that the employee spoke in a certain way, [but] the *point* of the speech in question." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir.1995) (emphasis in original).  Here, the point of McCray's memo was to express her displeasure with Mr. Womack's statements at the meeting.

Thus, McCray's speech is unprotected as a matter of law because she was not speaking "as a citizen" on a matter of public concern.

1.     PLAINTIFF'S SPEECH DID NOT ADDRESS "A MATTER OF PUBLIC CONCERN"

The Court also finds that Plaintiff's speech did not involve "a matter of public concern."  The requirements that a plaintiff must have spoken "as a citizen" and must have addressed matters of "public concern" are separate elements of a showing that a government employee's speech warrants First Amendment protection. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007).

While it is true that, as a general proposition, a "public concern" is one relating to "any matter of political, social or other concern to the community," *Connick v. Myers*, *supra*, 461 U.S. at 146, whether the speech addresses a matter of public concern is to be determined by looking to the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48; *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 229 (6th Cir. 2005) (quoting *Hardy v. Jefferson Community College*, 260 F.2d 671, 678 (6th Cir. 2001) (citing *Connick, supra*)).  This is also a question of law to be decided by the court. *Johnson v. University of Cincinnati*, 215 F.3d 561, 583 (6th Cir. 2000)

22

(citing *Rankin v. McPherson*, 483 U.S. 378, 386 n. 9 (1987)); *Jennings v. County of Washtenaw*, 475 F. Supp. 2d 692, 706 (E.D. Mich. 2007); *Omokehinde v. Detroit Bd. of Educ.*, 563 F. Supp. 2d 717, 724 (E.D. Mich. 2008).  In so doing, however, "consistent with the 'content' test of *Connick*, the pertinent question is not why the employee spoke, but what he said." *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir.2004); *see also Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003) (noting that "our duty is not to discern [the plaintiff's] underlying motive, but rather to evaluate her point as it is presented in the speech").

"In general, speech involves matters of public concern when it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *See Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001).  "Such matters of public concern are to be contrasted with internal personnel disputes, or complaints about an employer's performance." *Id*.  Thus, the mere fact that the employee's job dealt with public education, or public safety or welfare -- which, in a general sense, concerns the public -- does not *ipso facto* make the employee's speech a matter of public concern.  *See e.g., Nair v. Oakland County Comm. Mental Health Auth.*, 443 F.3d 469, 479 (6th Cir. 2006) (plaintiff's position as medical director of county mental health authority did not render statements made by him in a letter to the board of directors addressing his concerns about the executive director's proposed reduction in his responsibilities and

hours a matter of public concern).  *See also, Brown v. City of Trenton*, 867 F.2d 318, 322

(6th Cir. 1989) (complaints about police management are not transformed into statements

of public concern merely because police are charged with securing public safety);

*Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003) (statements concerning internal personnel

disputes do not touch upon a matter of public concern and therefore fall outside the scope

of First Amendment-protected speech.  *Id.* at 596 (citations omitted).)  Nor does "[t]he

mere fact that public monies and government efficiency are related to the subject of a

public employee's speech. . . qualify that speech as being addressed to a matter of public

concern." *Barnes v. McDowell, supra*, 848 F.2d at 734. As noted in *Barnes*, concerns

regarding public money and government efficiency could be raised in virtually any public

employment matter. *Id*.

Moreover, a matter does not become one of public concern simply because its

subject matter might be of some public interest.  *Gragg v. Kentucky Cabinet for

Workforce Development*, 289 F.3d 958, 965 (6th Cir. 2002).  The point of protection

afforded public employees is to allow public employees a voice on issues actually

affecting, and of interest to, the community-at-large.  *Id.*  Thus, the fact that what might

be "incidentally conveyed" by the speech, or that the speech contains "passing" or

"fleeting" references to an arguably public matter do not elevate the speech to a matter of

"public concern" where the "focus" or "point" of the speech advances only a private

interest.  *Farhat v. Jopke, supra*, 370 F.3d at 592-593 (citations omitted).

24

In this case, Plaintiff's criticism of Womack's statements and behavior at the Finance Committee meeting is not a matter of public concern. The "focus" of her speech is the advancement of a private interest. In her memo, Plaintiff merely voices her complaints about Womack's critical comments about the superintendent. The memo does not address the handling of the School District's finances or anything substantive concerning the Finance Committee decisions. Rather, it only criticizes one committee member's expression of his negative general opinion about Superintendent Calloway -- the person who recommended Plaintiff's hiring and with whom Plaintiff was personally and politically aligned.

Based upon the foregoing, the Court concludes that Plaintiff was not speaking "as a citizen on a matter of public concern" when she wrote her memo to Finance Committee Chairman Tyrone Winfrey complaining about Board Member Womack's conduct and statements at the July 17, 2008 Finance Committee Meeting. Therefore, her speech is not entitled to First Amendment protection. As such, her allegations of unconstitutional retaliation must fail. Therefore, the Court will enter summary judgment in favor of Defendants on Count I of Plaintiff's Complaint.

C.     PLAINTIFF'S HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE
       CLAIM OF RETALIATION IN VIOLATION OF THE MICHIGAN
       WHISTLEBLOWER'S PROTECTION ACT

In Count II of her Complaint Plaintiff alleges a violation of the Michigan Whistleblowers' Protection Act, M.C.L. § 15.362 (the "WPA") predicated upon her

25

having reported misconduct and mismanagement in the operation of DPS "to the Board, and to state and federal investigative agencies." *See* Complaint, ¶ 43.[9]

> The Michigan Whistleblowers' Protection Act provides:
>
> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing or inquiry held by that public body, or a court action.

M.C.L. 15.362.  A "public body" includes "[a]ny... body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body."  *Id.*  § 15.361(d)(iv).

The Michigan Supreme Court has noted that the Whistleblowers' Protection Act's main purpose is to alleviate "the inability to combat corruption or criminally irresponsible behavior in the conduct of government or large businesses." *Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 75, 503 N.W.2d 645 (1993).

In analyzing actions under the WPA, Michigan courts have adopted the shifting-burden framework used in Title VII and Michigan Civil Rights Act cases.  *Taylor v.*

---

[9] Although Plaintiff alleged in her Complaint reports to the Board and to state and federal investigative agencies, she admitted in her depositions that she did not make any report anything to federal authorities.  *See* Plaintiff's Dep., p. 418.  Therefore, the only reporting at issue here consisted of Plaintiff's regular reports to the School Board and to the Michigan Department of Education.

*Modern Engineering, Inc.*, 252 Mich. App. 655, 653 N.W.2d 625 (2002); *Hopkins v. City of Midland*, 158 Mich. App. 361, 380-81, 404 N.W.2d 744 (1987).  Therefore, to establish a *prima facie* claim of retaliation under the WPA, Plaintiff must establish that (1) she engaged in a protected activity as defined in the WPA; (2) she was discharged; and (3) a causal connection existed between the protected activity and her discharge.  *See Shallal v. Catholic Social Services of Wayne County*, 455 Mich. 604, 610, 566 N.W.2d 571 (1997).  The WPA contemplates three-types of protected activity:  "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation."  *Chandler v. Dowell Schlumberger, Inc.*, 456 Mich. 395, 399, 572 N.W.2d 210, 212 (1998).  It does not matter if the public body to which the suspected violation was reported was also the employee's employer.  *Brown v. City of Detroit*, 478 Mich. 589, 596, 734 N.W.2d 514, 517 (2007).

If the plaintiff is deemed successful in establishing a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate non-retaliatory business reason for terminating her employment.  *See Shaw v. City of Ecorse*, 283 Mich. App. 1, 8, 770 N.W.2d, 31, 37 (2009).  Once the defendant produces such evidence, the burden shifts back to the plaintiff to establish that the employer's proffered reasons were merely a pretext for retaliation.  *Id.*

In this case, Defendants do not dispute that Plaintiff reported to the Board that the DPS had been mismanaging state funds (prior to her arrival on the job) and made reports

27

to state agencies concerning the improper use of state funds.  They argue, however, that Plaintiff cannot establish a causal link between the reports and her termination.

To establish the causation element of a *prima facie* WPA claim, Plaintiff must show that her employer took adverse employment action because of her protected activity.  *West v. Gen Motors Corp.*, 469 Mich. 177, 185; 665 NW2d 468 (2003).  "A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence." *Shaw, supra*, 283 Mich. App at 14.  If a plaintiff only presents circumstantial evidence, such evidence "'must facilitate reasonable inferences of causation, not mere speculation.'" *Id*. at 15 (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 164; 516 NW2d 475 (1994)); *see also Sniecinski v. Blue Cross & Blue Shield*, 469 Mich. 124, 140; 666 NW2d 186 (2003) ("Mere speculation or conjecture is insufficient to establish a reasonable inference of causation.")  "In other words, the evidence presented will be sufficient to create a triable issue of fact if the jury could reasonably infer from the evidence that the employer's actions were motivated by retaliation," *Shaw*, 283 Mich. App at 15.  "Summary disposition for the defendant is appropriate when a plaintiff cannot factually demonstrate a causal link between the protected activity and the adverse employment action." *West*, 469 Mich. at 184.

However, it is settled that "a temporal relationship, standing alone, does not demonstrate a causal connection between [a] protected activity and any adverse employment action.  Something more than a temporal connection between protected

28

conduct and an adverse employment action is required to show causation. . . ." *West v. General Motors Corp.*, 469 Mich. 177, 186; 665 N.W. 2d 468 (2003); *Taylor v. Modern Engineering, Inc.*, 252 Mich. App. 655, 662, 653 N.W. 2d 625 (2002).  In *Henry v. Detroit*, 234 Mich. App. 405, 594 N.W.2d 107 (1999),  a close temporal relationship combined with the plaintiff's employer's "clear displeasure with the protected activity" was found to be enough to establish causation.

Plaintiff does not dispute that the reports upon which her Complaint allegations are based were made in August and September 2007, i.e., approximately 17 months before her employment was terminated.  *See* Plaintiff's Dep., pp. 333-337.  Plaintiff's reports are too remote in time in relation to the termination of her employment to establish a causal connection absent corroborating evidence.  *See Hamilton v. Starcom Mediavest Group*, 522 F.3d 623, 629 (6th Cir.2008) (nine months too long); *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir.2008) (two months too long). *But see Hamilton v. General Elec. Co.*, 556 F.3d 428 (6th Cir. 2009) (three months combined with evidence of "heightened scrutiny" of plaintiff's performance sufficient).[10]

Plaintiff here relies on nothing more than the fact that her termination occurred

---

[10] *Cf., Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir.2008).  Although in *Mickey*, the Sixth Circuit ruled that the close nexus between the employee's termination and his filing of an EEOC complaint was enough to show a causal connection for the plaintiff's retaliation claim where the employee was fired immediately after the his employer learned of his filing, the Sixth Circuit went on to rule that other circumstantial evidence supported the plaintiff's claim including his reduction in salary and benefits in 2004 and his employer's repeated questions regarding his retirement plans. *Id.* at 526.

after she reported the mismanagement and improper use of funds.  Unlike *Henry*, where, in addition to a temporal proximity, the plaintiff presented evidence that his superior expressed clear displeasure with the protected activity he had engaged in, Plaintiff here testified that the Board and the state actually "commended" her findings, and that the Board, in particular, was "pleased" with her for having uncovered the improper use of funds and for correcting the mismanagement noted in her reports.  *See* Plaintiff's Dep., p. 338, 342. Under these circumstances, the Court concludes that Plaintiff has failed to demonstrate a causal nexus between her protected activity and her termination.

In her Response Brief, Plaintiff also points to her report to the School Board in June 2008 about a deficit budget for the upcoming school year as a "protected activity" and argues that a reasonable juror could conclude it was this report which caused the Board to remove her as Treasurer of the Board and to terminate her position as CFO of the DPS in December 2008.  However, for a plaintiff to engage in protected activity, she must report "a violation or a suspected violation of a law or regulation or rule. . . ." M.C.L. § 15.362.  Informing the Board that the School District would have a budget deficit in the 2008 school year is not a report of "a violation or a suspected violation of a law or regulation or rule."   Hence, the reporting of a deficit budget cannot provide the basis for Plaintiff's WPA claim.

Assuming *arguendo* that Plaintiff has established a *prima facie* WPA claim, as in employment discrimination cases, once the plaintiff makes out a *prima facie* case, the

30

burden shifts to the employer to articulate a legitimate "non-retaliatory" reason for its

decision. *Hopkins v. City of Midland*, 158 Mich. App. 361, 379, 404 N.W. 2d 744, 751-

52 (1987). Here, Defendants have proffered a legitimate non-retaliatory reason for

Plaintiff's discharge -- her poor performance. Poor job performance is a legitimate non-

discriminatory reason for discharge. *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688,

695, 713-14, 568 N.W.2d 64 (1997). As evidence of their dissatisfaction with Plaintiff's

performance, Defendants here point to her failure to timely notify the Superintendent and

that the District was facing a deficit until June 2008, the month that District is required to

adopt its annual budget in accordance with State law. Further, Plaintiff submitted a

deficit budget to the Board for approval which resulted in the appointment of an

Emergency Financial Manager to take over management of the School District's funds.

She was also insubordinate to Board members. Courts and juries are not to sit as super-

personnel departments re-examining an employer's business decisions or "second

guessing" otherwise legitimate decisions. *Hazle v. Ford Motor Co*., 464 Mich. 456, 475-

76 , 628 N.W.2d 515 (2001) (quoting *Town v. Michigan Bell Tel. Co.*, 455 Mich. at 704).

Defendants having proffered a legitimate non-retaliatory reason, the burden of

production shifts back to Plaintiff to prove by a preponderance of the evidence that the

legitimate reason offered was a mere pretext for retaliation. *Hopkins, supra*, 158 Mich.

App. at 379, 404 N.W. 2d at 752; *Roulston v. Tendercare (Michigan), Inc.*, 239 Mich.

App. 270, 280-281, 608 N.W.2d 525 (2000). To do so, "[i]t is insufficient for a plaintiff

to "simply show that the employer's decision was wrong or mistaken, since the factual

31

dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Campbell v. Human Services Dep't*, 286 Mich. App. 230, 241, 780 N.W.2d 586 (2009) (quoting *Hazle*, 464 Mich. at 476 (citations and quotation marks omitted)).  Plaintiff must demonstrate that the evidence in the case is sufficient to permit a reasonable trier of fact to conclude that Plaintiff's protected activity was a motivating factor in the adverse action taken by the employer.  *Hazle v. Ford Motor Co.*, 464 Mich. at 465 (quoting *Lytle v. Malady* (On Rehearing), 458 Mich. 153, 176, 579 N.W.2d 906 (1998)). "A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Roulston, supra* at 281, citing *Hopkins v. Midland*, *supra*, 158 Mich. App at 380.  Plaintiff has failed to make this showing.

By disjointed and disjunctive bulleted statements, Plaintiff merely attempts to demonstrate a series of "inconsistencies" of non-material facts and isolated subjective opinions of various individuals, none of which even remotely demonstrate that the Board's dissatisfaction with Plaintiff's performance as Board Treasurer and CFO of the DPS is not worthy of credence or that the true reason for Plaintiff's discharge in December 2008 was her having reported the District's mismanagement and mishandling of finances in August-September 2007.

For example, Plaintiff points to the fact that one Board member, Carla Scott, testified that the superintendent had recommended that McCray keep her employment but

that another Board member, Joyce Hayes-Giles said that the superintendent made no such recommendation. *See* Plaintiff's Response, p. 15; Scott Dep., pp. 95-96, Response Br., Ex. 8; Hayes-Giles Dep., p 49, Response Br., Ex. 9. The inconsistent testimony of two individual members of the Board as to what the superintendent recommended is irrelevant because it is undisputed that the Board had the ultimate authority to hire and fire and could disregard the superintendent's recommendation, if it chose to do so. Furthermore, the Board could only act through a vote of the entire body; the views of two individual Board members, thus, do not represent the Board, as a whole.

In any event, divergent views as to whether McCray's contract should or should not have been renewed do not demonstrate that McCray's report to the Board that the DPS had been mismanaging state funds (prior to her arrival on the job) or her reports to state agencies concerning the improper use of state funds motivated the Board's decision to terminate her employment.

Similarly misplaced is Plaintiff's reliance on the fact that Carla Scott testified that the talk of firing McCray only surfaced in 2008 and had not been going on for months, as Defendant Womack suggested. *See* Plaintiff's Response Brief, p. 16 and Scott Dep. p 139, Ex. 8. According to Plaintiff, "[a] reasonable juror could conclude that the Board quickly made up its mind to fire McCray after it was announced in December 2008 that the State would indeed appoint an emergency financial manager because McCray had reported the fact of a deficit budget for '08." Response Brief, p. 16.

However, this does not demonstrate that the Board's true reason for terminating McCray's employment was her having engaged in a protected activity.  As set forth above in this Opinion, for a plaintiff to engage in protected activity, she must report "a violation or a suspected violation of a law or regulation or rule. . . ." M.C.L. § 15.362.  Informing the Board that the School District would have a budget deficit in the 2008 school year is not a report of "a violation or a suspected violation of a law or regulation or rule."

Nor is it relevant to the inquiry as to the motivating factor behind the Board's decision to terminate McCray that the Michigan Department of Education commended McCray for her coordinating efforts between the MDE and the DPS and wrote the Board in November 2008 that it viewed stability of key DPS staff (including Calloway and McCray) as "indispensable to the long range effort" with regard to the high risk initiative and high risk monitoring.  *See* Response Brief, p.  16, Response Ex., 11.  This evidence does not demonstrate that a retaliatory reason more likely motivated the Board or show that the Board's proffered explanation is unworthy of credence.

Based upon the foregoing, the Court concludes that Plaintiff has failed to make out a legally cognizable claim of retaliation in violation of the Michigan Whistleblowers' Protection Act.  Accordingly, Defendants' Motions for Summary Judgment on Count II of Plaintiff's Complaint will be granted.

D.      PLAINTIFF HAS FAILED TO MAKE OUT A CAUSE OF ACTION UNDER
        THE FALSE CLAIMS ACT

34

In Count III, Plaintiff asserts a cause of action under the False Claims Act, 31 U.S.C. § 3730(h).  The False Claims Act permits individuals with information exposing fraud committed against the United States to bring a *qui tam* action. 31 U.S.C. § 3730(b). An individual may also bring an action on his or her own behalf. § 3730(h). In order to establish a *prima facie* claim under § 3730(h), a plaintiff must prove "1) she was engaged in a protected activity; and 2) that her employer knew about it." *McKenzie v. BellSouth Telecomm*., Inc., 219 F.3d 508, 514 (6th Cir.2000). In addition, the plaintiff must prove that her employer terminated her employment or engaged in some kind of discrimination against her as a consequence of the protected activity.  *Id*.  Protected activity includes investigation or other steps taken "in furtherance of [a *qui tam* ] action." § 3730(h). Although protected activity is to be construed broadly, it must be "reasonably connected to the FCA" and "sufficiently further [ ]" such an action in order to be protected activity. *McKenzie*, 219 F.3d at 515–16. "Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government."  *Id*. at 516. Furthermore, the employee must provide "sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a *qui tam* action against it." *Id*. at 517.

Although Plaintiff alleges in Paragraph 51 of her Complaint that "[t]he Board's misuse of Title I monies for purposes other than those expressly permitted under the No

35

Child Left Behind Program constitutes a violation of 31 U.S.C. § 3729, for which

McCray could pursue a *qui tam* action," Plaintiff has not alleged that she, in fact, was

pursuing, or ever investigated matters in preparation for her pursuit of, a *qui tam* action.

Further, she does not allege any fraud upon the government or that she investigated any

such suspected fraud.  Her admitted only involvement with federal government agencies

was her cooperation with the federal government's ongoing audit of the District's use of

Title I funds in her official capacity as CFO.  *See* Plaintiff's Dep., pp. 362-64; 430.  It is,

therefore, not surprising that Plaintiff has presented no opposition whatsoever in her

Response Brief to Defendants' arguments for dismissal of her FCA claim.  Not being

opposed, the Court will accordingly grant Defendants' motion for summary judgment on

Count III.

E.     PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT
       IS UNTIMELY

       Six weeks after all briefing on Defendants' Motions for Summary Judgment was

completed, Plaintiff filed a Motion for Leave to File an Amended Complaint seeking to

add an entirely new claim -- one for breach of contract, predicated upon Defendants'

purported violation of the notice of nonrenewal of employment contract provisions of

M.C.L. § 380.471a.  Plaintiff claims to have only discovered the existence of this cause

of action after reviewing Defendant Marie Thornton's Motion for Summary Judgment

which was filed three months earlier.  Plaintiff claims that it was only through the filing

of Ms. Thornton's motion for summary judgment that she came to realize that she had

not been provided the 90-days' notice of nonrenewal of her contract of employment to which she was entitled under the Section 471a.

In making this argument, Plaintiff appears to overlook the fact that she was afforded nearly **two full years** to conduct discovery prior to the filing of any of the Defendants' dispositive motions. The parties were, in fact, granted **four** extensions of the discovery and the dispositive motion deadlines in this case. And, yet, despite these extensions, it was not until after all of the motions for summary judgment were filed and responded to that Plaintiff moved to amend her complaint.

Under Fed. R. Civ. P. 15, leave to amend a complaint is to be "freely given when justice so requires." The Sixth Circuit has identified several factors for the court to weigh when considering a motion to amend a complaint:

> Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Wade v. Knoxville Utils. Bd*., 259 F.3d 452, 458-59 (6th Cir.2001) (quoting *Head v. Jellico Hous. Auth*., 870 F.2d 1117, 1123 (6th Cir.1989)). "When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Id*. at 459.

The Sixth Circuit has held that allowing amendment after the close of discovery

37

creates significant prejudice, and other Circuits agree.  *See Duggins v. Steak 'n' Shake*, 195 F.3d 825, 834-835 (6th Cir. 1999); *Moore v. City of Paducah*, 790 F.2d 557, 560 (6th Cir. 1986) (citing with approval *Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15 (1st Cir.1979)). *See also Campbell v. Emory Clinic*, 166 F.3d 1157 (11th Cir.1999); *MacDraw, Inc. v. CIT Group Equip. Financing, Inc.*, 157 F.3d 956 (2d Cir.1998); *Ferguson v. Roberts*, 11 F.3d 696 (7th Cir.1993); *Averbach v. Rival Mfg. Co.*, 879 F.2d 1196 (3rd Cir.1989).

The Court's review of Plaintiff's proposed amendments and the original Complaint shows that the Plaintiff had to have been aware of the factual basis for the claims she seeks to add from the time she filed her lawsuit, more than three years ago. She has known since at least September 24, 2008, how much notice she was given of the Board's intention of non-renewal of her contract.  *See* Exhibit 1 to Plaintiff's Supplemental Brief in Support of Motion for Leave to File Amended Complaint, [Dkt. # 64-2.]  Yet Plaintiff delayed pursuing this claim until after discovery was closed, the dispositive motion deadline had passed, and three separate motions for summary judgment had been filed. There appears to be no justification for the delay -- other than the fact that Plaintiff failed to take sufficient discovery during the four-times extended discovery period. Allowing amendment at this late stage in the litigation would create significant prejudice to the Defendants in having to reopen discovery and prepare a defense for a claim quite different from retaliation claims presented in the original

38

Complaint.

Based upon the foregoing, Plaintiff's Motion for Leave to File an Amended

Complaint will be denied.

CONCLUSION

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motions for Summary Judgment

**[Dkt. Nos. 49, 57 and 58]** are hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to File an

Amended Complaint **[Dkt. No. 63]** is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion to Retake the Deposition

of Plaintiff **Dkt. No. 71]** is DENIED as MOOT.

IT IS FURTHER ORDERED that Plaintiff's Complaint be DISMISSED, in its

entirety, with prejudice.

Let Judgment be entered accordingly.


                              s/Gerald E. Rosen_____
                              Chief Judge, United States District Court

Dated:  March 29, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on March 29, 2013, by electronic and/or ordinary mail.

                              s/Julie Owens_____
                              Case Manager, (313) 234-5135


39